**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Chapter 7 |
| | § | |
| ACACIA OPERATING COMPANY, LLC, | § | Case No. 24-70194-SMR |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

**THE STATE OF NEW MEXICO'S OBJECTION TO CHAPTER 7 TRUSTEE'S MOTION TO APPROVE SALE OF CERTAIN OIL AND GAS LEASES AND RELATED PROPERTY**
**(Doc. 93)**

THE STATE OF NEW MEXICO, by and through Attorney General Raúl Torrez, and the Oil Conservation Division ("OCD") of the New Mexico Energy, Minerals and Natural Resources Department (collectively, "New Mexico" or "the State"), hereby object to the Chapter 7 Trustee's *Motion to Approve Sale of Certain Oil and Gas Leases and Related Property*, filed March 3, 2026 as Doc. 93 ("Sale Motion"). In support of this objection, New Mexico respectfully states as follows:

## I.   OVERVIEW

Pursuant to 11 U.S.C. §363(b) and (f), the Trustee seeks to sell oil and gas wells located in the State of New Mexico to Jonathan Samaniego and American Energy Resources, LLC ("Samaniego," "AER," and together, "Proposed Purchasers").

Under the laws of New Mexico, when oil and gas interests are sold, operating and plugging obligations do not automatically transfer to the buyer, but require express approval by OCD following the filing of a change-of-operator application. Among other requirements for approval,

the new operator must be in compliance with various oil and gas regulations enforced by OCD. The Proposed Purchasers are not in compliance with OCD regulations and have a history of fraud and misrepresentation both to OCD and others.

On March 10, 2025, OCD sent a Letter of Noncompliance to Mr. Samaniego and AER, notifying AER of numerous violations. This Letter of Noncompliance also raised AER's misrepresentations of well transfers and production. The Proposed Purchasers have not resolved the issues in the Letter of Noncompliance and are not eligible to have any inactive wells transferred into their ownership, because to do so, OCD would have to enter into an agreed compliance order with AER, which OCD is not prepared to do. All of the wells in the proposed sale are currently inactive. As such, even if the Court approves the proposed sale, OCD cannot approve transfer of the wells to the Proposed Purchasers under the current circumstances.

Because the Trustee's proposed sale seeks to sell oil and gas wells to a Proposed Purchaser that is out of compliance with State law and therefore not able to assume operating authority for these wells, the sale would serve no sound business purpose but rather run counter to the interests of the bankruptcy estate. Even if the Court grants the Sale Motion, OCD will not approve the transfer under the current circumstances. As such, under OCD regulations, the Debtor, Acacia Operating, LLC, would remain as operator-of-record for these wells and liable for plugging and remediation while, at the same time, the Estate's best assets will have been sold for minimal consideration that will not cover the plugging and remediation costs.[1]

---

[1] If the sale is approved, the Proposed Purchasers may also be held liable for plugging and remediation expenses, depending on the lease; however, the operator of record is liable for these costs and expenses.

## II.  BACKGROUND

1.  The Sale Motion proposes to sell 86 oil and gas wells of Debtor Acacia Resources, LLC ("Debtor"), amounting to all of the Debtor's oil and gas wells other than those located on state land, to Jonathan Samaniego and his company, American Energy Resources, LLC ("AER").

2.  In his Sale Motion, the Trustee noted that he was uncertain whether those assets belong to Acacia Resources, LLC, or Acacia Operating, LLC. *See* Sale Motion at 1–2 n.2. According to filings in the Remnant Bankruptcy, those assets were sold to Acacia Resources after Samaniego, the stalking horse bidder in the Remnant bankruptcy, failed to close.[2]

3.  This sale from Remnant to Acacia Resources, LLC is also documented in the real property records of Eddy County, New Mexico.[3] Absent a showing to the contrary, it should be assumed that Acacia Resources, LLC, still owns those wells.[4]

4.  Of the 86 wells in the proposed sale, nine have already been approved for plugging using the State's Reclamation Fund. The remaining 77 wells are inactive, with last reported production in or before July 2024.

5.  Pursuant to 19.15.25.8(B)(3) NMAC, an operator must either "properly plug and abandon a well or place the well in approved temporary abandonment . . . within 90 days after . . . a period of one year in which a well has been continuously inactive."

---

[2] **EX A** - *Amended Order Granting Motion of Ronald Ingalls, Chapter 7 Trustee to Sell Real Property Free and Clear of Liens, Claims, Interests and Encumbrances (Oil and Gas Interests)* ¶ 2 (filed June 30, 2020), Doc. 452, *In Re Remnant Oil Company, LLC*, No. 19-70106 (Bank. W. Tex.) ("If Mr. Samaniego fails to close in a timely manner, the Trustee may forfeit the down payment and sell to Acacia Resources, LLC for $402,000.00 on the same terms and conditions as the Mr. Samaniego contract.").

[3] **EX B** - Copy of recorded *Blanket Assignment, Bill of Sale, and Conveyance*.

[4] Nevertheless, as the State alleges upon information and belief in its Complaint, Acacia Resources and Acacia Operating were not operated in a legitimate fashion, nor were they operated independently from each other. Neither company observed corporate formalities such as minutes or bookkeeping, but commingled individual and shareholder funds. *See* Complaint ¶ 303. So, while Acacia Operating is a single-member organization, owned by Acacia Resources, the exact relationship between the two entities is unclear.

6.      At an estimated average of $163,000 to plug (let alone remediate) a well site, AER is looking at a minimum financial liability of approximately $12.5 million for the 77 wells, and another approximately $1.4 million to reimburse the State for the nine wells approved for plugging using the Reclamation Fund.

7.      Before OCD could approve the change of operator application, AER would be required to provide a plugging and reclamation bond. Nothing in the sale motion suggests that AER has secured, or can secure, the required bond.

8.      As explained more fully below, AER has a history of noncompliance with OCD regulations, and Mr. Samaniego has a history of fraud. Because OCD will not approve the transfer of these wells to AER under the current circumstances, and because it is highly likely that AER is not a good faith purchaser, the Sale Motion should be denied.

9.      Alternatively, if the Court approves the proposed sale, the State asks that protective language be included in the sale order to clarify that the well plugging and abandonment obligations are not extinguished under section 363(f) of the Bankruptcy Code. It also asks that the State's interest in financial assurance of $250,000 (initially a Letter of Credit to OCD, that has recently been converted to a cash bond) be resolved prior to any sale.

### III.    OBJECTION

10.     The Court should deny the Sale Motion for five main reasons: *First*, there is no sound business purpose for this sale because AER will not be able to obtain regulatory approval for the transfer of operating authority and plugging liabilities from OCD at the current time. *Second*, because the Proposed Purchasers cannot obtain regulatory approval for the transfer, the Proposed Purchasers cannot fulfill a fundamental requirement of the sale. *Third*, in light of their

documented fraudulent activities, the Proposed Purchasers are not good faith purchasers and must bear the burden of proving otherwise. *Fourth*, the sale is not in the best interest of the bankruptcy estate. *Fifth*, the Proposed Purchasers will not be able to satisfy the environmental liabilities and plugging and remediation costs of the proposed assets.

**A.      THE SALE AS PROPOSED DOES NOT SATISFY THE "BUSINESS JUDGMENT" STANDARD REQUIRED BY 11 U.S.C. § 363(B)(1).**

11.      For a sale outside the ordinary course of business brought pursuant to 11 U.S.C. § 363(b)(1) to be approved, the Trustee must show that "(a) a sound business justification exists for the sale; (b) fair and reasonable consideration is provided; (c) the transaction has been proposed in good faith; and (d) adequate and reasonable notice is provided." *In re N. Am. Techs. Group, Inc.*, 2010 Bankr. LEXIS 5834 at *6-7 (Bankr. E.D. Tex. August 16, 2010) (*citing In re Condere*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998)).  If the Proposed Purchasers seek to be held "good-faith purchaser[s]" pursuant to 11 U.S.C. § 363(m), the Proposed Purchasers "bear[] the burden of establishing good faith." *Matter of RE Palm Springs II, L.L.C.*, 65 F.4th 752, 758–59 (5th Cir. 2023).

> **i.      *There is no sound business judgment for this sale because the Proposed Purchasers are not legally allowed to operate these wells because they are not in compliance with State laws.***

12.      OCD is tasked with implementing New Mexico's robust regulatory program for the oversight of oil and gas operations, promulgated pursuant to the Oil and Gas Act. *See* N.M. Stat. Ann. §§ 70-2-1 to -39; 19.15.2.1 to 19.15.109.10 NMAC.

13.      Among other things, the program sets the conditions under which OCD may approve a change-of-operator application for oil and gas wells. Operating authority for a well may not be transferred or assigned without approval by OCD. 19.15.9.9 NMAC.

14.     Section 19.15.9.9(C) NMAC provides two conditions under which OCD may deny a change of operator application: first, if "the new operator is not in compliance with Subsection A of 19.15.5.9 NMAC" (which, in relevant part, limits the number of inactive wells an operator may operate to "two wells or fifty percent of the wells the operator operates, whichever is less, if the operator operates 100 wells or less," 19.15.5.9 NMAC), 19.15.9.9(C)(1) NMAC; or second, if the wells are "subject to a compliance order" under 19.15.25.8 NMAC and the "new operator has not entered into an agreed compliance order setting a schedule for compliance with the existing order," 19.15.9.9(C)(2) NMAC.

15.     Currently, OCD will not approve the transfer of operating authority for these wells to AER because AER and Mr. Samaniego have a history of noncompliance with OCD regulations and misrepresentations to OCD about transfers and production, OCD will not enter into an ACO with AER under the current circumstances, and it is unknown whether AER can afford to post the financial assurance required for such a transfer.

### ii.     *AER has a history of noncompliance with, and misrepresentations to, OCD.*

16.     AER is an existing operator registered with OCD, operating three active oil and gas wells in New Mexico and another six undrilled well sites; it is therefore subject to the requirements of New Mexico's oil and gas regulatory program.

17.     In a letter dated March 10, 2025, addressed to Jonathan Samaniego and AER, OCD provided written notice that AER "is currently out of compliance with 19.15.5.9 NMAC and 19.15.25.8 NMAC."[5]

---

[5] **EX C** – Notice of Non-Compliance.

18.     The Notice of Non-Compliance provided notice that AER "is not eligible to transfer of any inactive wells" because, following acquisition of three inactive wells from WildCat Energy, LLC, the number of inactive wells operated by AER exceeded the number of inactive wells allowed under 19.15.25.8 NMAC.[6]

19.     The Notice of Non-Compliance also alleged material misrepresentations on the part of AER in its transfer application, because AER had failed to timely transfer inactive wells that it had acquired from WildCat. AER delayed transfer of the WildCat wells by over six years by failing to file the required change-of-operator application until December 2024, even though the sale was executed in November 2018.[7]

20.     The Notice of Non-Compliance has not been resolved, revoked, or withdrawn.

21.     Although AER reported low production for its wells during 2025—presumably in an attempt to bring its wells back into compliance, at least on paper—OCD investigations reveal that the reported production numbers are fraudulent or inaccurate. Despite recent reports of production from these three wells, AER has either failed to report production, or reported zero production, from 2011 through 2024. OCD investigated the wells that are allegedly now producing and found that some of these wells are not functioning.

### iii.     *OCD will not enter an agreed compliance order with AER.*

22.     Even assuming, *arguendo*, that AER *was* in compliance with OCD regulations to satisfy 19.15.9.9(C)(1) NMAC (which OCD does not concede), for OCD to approve the transfer of 86 inactive wells to AER, OCD would have to enter into an agreed compliance order ("ACO") with AER pursuant to 19.15.9.9(C)(2) NMAC.

---

[6] *Id.*
[7] *Id.*

23. Given AER's past history of noncompliance and misrepresentation, OCD will not enter into an ACO with AER under the current circumstances. *See* 19.15.9.9(D) NMAC. Absent satisfactory explanations and extraordinary rehabilitation of operator conduct, OCD cannot identify acceptable terms that comport with its mandate to enforce the Oil and Gas Act and its associated rules.

### iv. *AER has not shown it can obtain the requisite financial assurance required by law.*

24. Assuming for the sake of argument that OCD overlooked AER's previous noncompliance and material misrepresentations (which it will not), or assuming that AER was able to demonstrate extraordinary rehabilitation to satisfy the regulator, OCD would still have to consider whether AER could provide sufficient financial assurance under 19.15.8.9 NMAC. *See* 19.15.9.9(D) NMAC.

25. To meet 19.15.8.9 NMAC's requirements, AER would need to post sufficient financial assurance for the wells prior to approval of the transfer. At minimum, AER would need to post a $125,000 blanket bond per 19.15.8.9(C)(2)(c).

26. Nothing in the Sale Motion addresses whether AER has secured, or has the ability to secure, financial assurance at the requisite amounts.

27. Given that all 86 wells listed in the Sale Motion are inactive (including wells on the Reclamation Fund Approved list and including wells subject to Remnant's 2018 Settlement Agreement requiring plugging), it is highly unlikely that AER will be able to secure the required financial assurance from a financial institution in the form and amount specified by 19.15.8.9 NMAC.

28.     In sum, OCD will not approve a change-of-operator application from Acacia to AER under the current circumstances and will not currently enter an ACO with AER given its history of noncompliance and misrepresentations.  Therefore, if the sale were to be approved, the operating authority and plugging obligations for the wells would remain with the Debtor, Acacia Operating Company, LLC, because it would remain the operator of record.[8]

29.     As such, the Sale Motion  should be denied, because there is no sound business justification for this sale.

**B.      THE TERMS OF THE PURCHASE AND SALE AGREEMENT REQUIRE THE PROPOSED PURCHASER TO TRANSFER THE OPERATIONS OF THESE WELLS FROM THE DEBTOR TO THE PROPOSED PURCHASER—A REQUIREMENT THE PROPOSED PURCHASERS CANNOT FULFILL.**

30.     Pursuant to paragraph 5 of the Purchase and Sale Agreement, the Proposed Purchasers are responsible for "all liabilities and obligations related to the Assets arising from and after the Closing Date, including regulatory compliance and P-4 transfers."

31.     A P-4 transfer refers to the "Certificate of Compliance and Transportation Authority" form used by The Railroad Commission of Texas when operators of oil and gas wells change. *See* https://www.rrc.texas.gov/oil-and-gas/oil-and-gas-forms/.

32.     OCD does not utilize Texas's P-4 forms when transferring operations of oil and gas wells in New Mexico; instead, OCD requires that a C-145 Change of Operator form and a Facilities Transfer Form be submitted and approved by OCD before operations and liability for wells can be transferred from the selling operator to the purchasing operator. *See* Form C-145 and instructions here: https://www.emnrd.nm.gov/ocd/ocd-forms/.

---

[8] *See* n.1, *supra.*

33. Currently, Acacia Operating Company, LLC is the operator-of-record for the wells subject to this sale. As such, Acacia Operating is liable for the operation of these wells, including, but not limited to all plugging and remediation.

34. As set out in Section A(i), above, currently, AER and Mr. Samaniego are not in compliance with OCD regulations, and there is an outstanding, unresolved Notice of Non-Compliance against them. Consequently, pursuant to state law, OCD will not approve the transfer of operating authority for these wells to AER under the current circumstances.

35. Interestingly, the Purchase and Sale Agreement does not specify what happens if the Proposed Purchaser cannot get the operations transferred from the Debtor to the Purchaser, and this creates the possible issue that the Debtor will be left as the operator-of-record even after this sale.

36. Therefore, this Sale should be denied because under New Mexico law, the Proposed Purchasers are not in compliance with OCD regulations, and, as such, cannot assume operating authority or plugging obligations for these wells as required under the Purchase and Sale Agreement.

**C.** **UNDER 11 U.S.C. § 363(M), THE PROPOSED PURCHASERS BEAR THE BURDEN OF SHOWING THAT THEY ARE ACTING IN GOOD FAITH.**

37. The State also objects to this sale because it believes that Samaniego and AER are not good faith purchasers. In the Fifth Circuit, a purchaser's "good faith status" may be "destroyed" by "misconduct . . . involv[ing] fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014) (citations and footnotes omitted).

38. On March 10, 2025, OCD sent a Notice of Non-Compliance to Mr. Samaniego and AER, notifying them of numerous violations, and that, until these issues are resolved, they are not eligible to have the operating authority for inactive wells transferred to them.[9]

39. Despite being put on notice of their noncompliance, the Proposed Purchasers have negotiated a sale for wells that the Proposed Purchasers should know they will not be able to operate.

40. This is not the first time Mr. Samaniego has sought to purchase these wells from a bankruptcy. In the Remnant bankruptcy (the precursor to this case), Mr. Samaniego won the bid to purchase these wells. However, Mr. Samaniego failed to close on Remnant's assets, thereby allowing Acacia to purchase the wells. Such actions raise even more questions about the good-faith basis of this latest sale proposal.[10]

41. It is ironic that the only proposed buyer for the oil and gas wells that are at issue in the State's fraud case pending against Acacia and other parties is, himself, the defendant in several fraud cases. *See, e.g.*, *Dowling v. Samaniego*, D-503-CV-2023-00669 (court granting summary judgment against Mr. Samaniego and AER in a case bringing claims for, *inter alia*, conversion, forgery, fraud, and unjust enrichment); *William Scott Simpson v. Jonathan Samaniego*, D-504-CV-00576 (settling claims against Mr. Samaniego for case bringing claims for fraud, duress, unconscionability).

---

[9] *See* EX C.
[10] **EX D** - *Notice of Default by Successful Bidder* (filed July 7, 2020), Doc. 457, *In Re Remnant Oil Company, LLC*, No. 19-70106 (Bank. W. Tex.).

42. As explained above, Samaniego's personal proclivity to fraud has overlapped with his duties as Manager of AER. For example, OCD investigations have also revealed that AER's production reporting is fraudulent. *See* ¶ 21, *supra*.

43. Samaniego and AER are not good-faith buyers because, among other things, they have entered into this sale with the outstanding Letter of Non-Compliance and the inability to have operating authority for these wells transferred into their name by OCD, and, as such, cannot take over operation of these wells and the plugging and environmental liabilities attendant thereto from the Trustee and bankruptcy estate.

**D.   THE PROPOSED SALE IS NOT IN THE BEST INTEREST OF THE BANKRUPTCY ESTATE.**

44. If the Court were to approve the proposed sale and were OCD to deny any resulting change-of-operator application, the bankruptcy proceedings would acquire significant additional levels of complexity because the bankruptcy estate would remain liable for plugging and remediating all 86 wells, while title to these wells would purportedly be held by AER pursuant to the sale order.

45. Further, the Trustee cannot abandon these 86 wells in contravention of New Mexico state laws that protect human health, safety, and the environment,[11] and, upon information and belief, the Trustee does not have the funds to properly plug and remediate these wells. If OCD were to plug these wells during this bankruptcy proceeding, OCD would have an administrative expense claim in this bankruptcy,[12] which would most probably be so large that no monies would flow to general unsecured creditors.

---

[11] *See Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494 (1986).
[12] *See In re H.L.S. Energy*, 151 F.3d 434 (5th Cir. 1998).

46.     The sale to the Proposed Purchasers does not benefit the estate because the Proposed Purchasers currently cannot have the operations of these oil and gas wells transferred to them because they are not in compliance with OCD regulations governing the transfer of wells.

47.     The bankruptcy estate would be better served if the Trustee could find a purchaser that can legally receive transfer of and operate the wells under New Mexico state law.

**E.     THE STATE OF NEW MEXICO OBJECTS TO THE SALE BECAUSE ENVIRONMENTAL AND PLUGGING LIABILITIES WILL NOT BE SATISFIED BY AER OR SAMANIEGO.**

48.     As a creditor and plugger of last resort for these wells, the State of New Mexico has an interest in the wells the Trustee seeks to sell. *See* 11 U.S.C. § 363(e) ("Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property . . . proposed to be . . . sold . . . the court shall . . . prohibit or condition such sale . . . as is necessary to provide adequate protection of such interest.").

49.     The Sale Motion excludes Acacia's wells located on state land. But wells on private and federal land are also subject to the requirements of New Mexico's oil and gas regulatory program and may ultimately need to be plugged at the State's expense. Indeed, nine of the wells in the proposed sale have already been approved for plugging using the State's Reclamation Fund even though they are on federal land and are for federal mineral leases.

50.     The State therefore has an interest in this sale as an enforcer of New Mexico's oil and gas regulatory program and as the plugger of last resort for all oil and gas wells within the jurisdiction of New Mexico, whether they are on state, federal, or private land.

51.     As such, the State is concerned that the Proposed Purchasers will strip these marginally producing wells of their remaining economic value, while seeking to avoid the well plugging and abandonment obligations under New Mexico law in a subsequent bankruptcy.

52.     Further, absent a showing from AER that it has the capital to plug and remediate the 86 inactive wells in the proposed Sale Order, or, at minimum, that it is able to post the requisite amounts of bonding, it is highly likely that this sale will render AER functionally insolvent.

53.     At an estimated average of $163,000 to plug (let alone remediate) a well site, AER is looking at a minimum financial liability of approximately $12.5 million for the 77 wells, and another $1.4 million in reimbursements for the nine wells approved for the Reclamation Fund, once OCD has plugged them.

54.     By paying $40,000 for these wells that have millions of dollars of liability, it is beyond doubt that AER will *not* receive "a reasonably equivalent value in exchange" for accepting this obligation; and clearly AER, as an operator of oil and gas wells in New Mexico, is "about to engage in a business . . . for which the remaining assets . . . were unreasonably small in relation to the business" or that Mr. Samaniego "reasonably should have believed that [AER] would incur, debts beyond [AER's] ability to pay as they became due." N.M. Stat. Ann. § 56-10-18(2).

55.     The State should not be forced to sit back and watch while the same scheme plays out *ad infinitum* over consecutive bankruptcies. The State cannot afford to expend the time and resources needed to monitor every insolvent operator's bankruptcy proceedings to ensure that well plugging and abandonment obligations are not the proverbial can kicked down the road each and every time.

56.     This is one case in which the can should most definitely stop here.


(*Remainder of the Page Intentionally Left Blank*)

IV. **ALTERNATIVELY, SHOULD THE COURT APPROVE THE SALE, THE STATE'S INTEREST IN ACACIA'S FINANCIAL ASSURANCE SHOULD BE RESOLVED PRIOR TO ANY SALE, AND PROTECTIVE LANGUAGE ADDED TO ANY SALE ORDER.**

57. In the event that the Court disagrees with the State and approves the proposed sale over the State's Objection, the State requests: (a) that the Court resolve the State's interest in the financial assurance; and (b) that the Court add protective language to any sale order preserving the State's rights.

A. **THE OUTSTANDING FINANCIAL ASSURANCE IS NOT PROPERTY OF THE BANKRUPTCY ESTATE.**

58. When OCD is obligated to plug an operator's wells, OCD is authorized to draw down the financial assurance provided by the operator. N.M. Stat. Ann. § 70-2-14.

59. At the time of filing of the bankruptcy petition, Acacia's financial assurance was in the form of a Letter of Credit;[13] however, on March 16, 2026, Marquis R. Gilmore, Jr. Signed documents changing the financial assurance from a Letter of Credit to a Cash Bond.[14] Under New Mexico regulations, cash bonds posted for financial assurance are funds held in trust for OCD. 19.15.8.10(B) NMAC.

60. In the Fifth Circuit, when a state statute creates a trust, courts recognize it as an express trust that is not property of the bankruptcy estate. *See Lone Star Milk Producers, Inc. v. Litzler*, 370 B.R. 671, 678-79 (Bankr. N.D. Tex. 2007) (observing that "[t]he Fifth Circuit has held that trusts created by statute are express trusts" and applying this principle to a trust formed by the Texas Agricultural Code (citing *Carey Lumber Co. v. Bell*, 615 F.2d 370, 374 (5th Cir. 1980))); *see also Thlocco v. Magnolia Petroleum Co.*, 141 F.2d 934, 937 (5th Cir. 1944) (interpreting a

---

[13] **EX E** – OCD's approval letter accepting the original letter of credit as financial assurance.
[14] **EX F** - Cash Bond documents Dated March 16, 2026.

statute appointing a trustee to hold property in trust for the benefit of an incompetent person and holding that "it is quite clear that the trust in question here was neither resulting nor constructive, but an express trust created for the purpose of enabling [the trustee], to deal freely with [the property]"); *In re Emerald Oil Co.*, 807 F.2d 1234, 1238 (5th Cir. 1987) ("[A] debtor's estate in bankruptcy does not include property in which the debtor holds bare legal title subject to the equitable interests of third parties.").

61.     Even if Acacia's financial assurance was in the form of a Letter of Credit, this result would be the same because, like bonds held in trust, letters of credit are also not property of the bankruptcy estate. *See Litzler v. Chamblee & Ryan, P.C. (In re TIC United Corp.)*, No. 00-37234, 2008 Bankr. LEXIS 2040, *19 (Bankr. N.D. Tex. June 17, 2008) ("The Fifth Circuit has stated that '[i]t is well-established in this circuit that letters of credit and the proceeds therefrom are not property of the debtor's bankruptcy estate. Insofar as letters of credit embody obligations between the issuer and beneficiary, such contractual rights and duties are entirely separate from the debtor's estate.'" (quoting *In re Stonebridge*,430 F.3d 260, 269 (5th Cir. 2005))).

62.     However, Acacia wrongly indicated that the financial assurance (then in the form of a Letter of Credit) is the primary collateral to secure a debt of $3,240,000.00 to Cibolo Energy Resources. *See* Schedule of Assets at 10, filed Jan. 10, 2025 (Doc. 7), *In re Acacia Operating, LLC*, No. 24-70194.

63.     To put this issue into perspective, Cibolo Energy Resources was formed by and is managed by Marquis Reed Gilmore Jr.,[15] who provided the replacement Cash Bond. Both Mr.

---

[15] **EX G** – Cibolo Energy Resources formation documents and most recent Texas Franchise Tax Public Information Report.

Gilmore and Cibolo Energy Resources are referred to in recent filings in this docket as being among the "Gilmore Parties." Doc. 83.

64.     Further, although Mr. Robert Stitzel signed the bankruptcy petition for Acacia Resources, LLC, as "Manager,"[16] according to the Texas Secretary of State's records, Mr. Stitzel has never been listed as a manager of Acacia Resources.[17] Rather, the only Manager listed in the most recent public information report is Mr. Gilmore.[18]

65.     So, the purported secured debt owed to Cibolo is owed to an insider and sole manager of the Debtor, Mr. Gilmore.

66.     Because neither the cash bond nor the former Letter of Credit are property of the Estate, the cash bond cannot be used as collateral to secure any debt to Mr. Gilmore's Cibolo Energy Resources.

67.     It is unclear whether the proposed sale will impact the financial assurance and if the proceeds of the proposed sale would be distributed in accordance with the priorities of the Bankruptcy Code. According to the proposed Purchase and Sale Agreement, "[t]he sale proceeds shall be distributed in accordance with the Carveout Agreement" entered into by the Trustee and Cibolo Energy Resources on April 10, 2025.

68.     Meanwhile, the Sale Motion mentions that "a percentage of the sale proceeds (25% of the first $100,000) is carved out for the benefit of unsecured creditors and administrative creditors." Sale Motion at 2. However, the well plugging and abandonment obligations are administrative expenses and must be satisfied before any general unsecured claims. *Texas v. Lowe*

---

[16] *See* Petition, Dkt. No. 1 *In re Acacia Resources*, LLC, Case No. 24-70195-SMR.
[17] **EX H** – Texas Secretary of State's records of formation and public information reports for Acacia Resources, LLC.
[18] *Id.*

*(In re HLS Energy Co.)*, 151 F.3d 434 (5th Cir. 1998); *In re Am. Coastal Energy, Inc.*, 399 B.R. 805, 814–17 (Bankr. S.D. Tex. 2009).

69.     The Sale Motion references a "Carveout Agreement" entered into by the Trustee and Cibolo Energy Resources on April 10, 2025. This Carveout Agreement has not been filed in this docket, and the State has not had an opportunity to review its terms. It is therefore unknown to the State whether the Carveout Agreement addresses the financial assurance or otherwise has the potential to impair the State's rights.

70.     The State disputes that the cash bond may be characterized as an asset of the Estate or that it can be considered collateral to secure any debt to any party other than the State.

71.     The State filed proofs of claim that encompass the $250,000 financial assurance.[19]

72.     If the State is obligated to bear the costs of plugging wells remaining with the Estate, and/or is not allowed to collect the financial assurance, its interests will be impermissibly impaired. Nor would the State's concerns be adequately addressed by its ability to recover the costs of plugging as administrative claims in this bankruptcy. The exceedingly low purchase price of $40,000 is inadequate to cover the costs of plugging even a single well, even if the State's administrative claims were given priority above other administrative claims, including those of the Trustee.

73.     Even if AER were an acceptable buyer (or should the Trustee identify an alternative buyer), the Court should not approve any sale until the State's ability to collect the financial

---

[19] *See Proof of Claim # 6*, filed May 20, 2025, by the New Mexico Department of Justice; *Proof of Claim #16*, filed June 25, 2025, by the New Mexico Energy, Minerals, and Natural Resources Department, in *Claims Register* for Acacia Operating Company, LLC, 24-70194; *Proof of Claim #12*, filed June 25, 2025, by the New Mexico Department of Justice; *Proof of Claim #13*, filed June 25, 2025, by the New Mexico Energy, Minerals, and Natural Resources Department, in *Claims Register* for Acacia Resources, LLC, 24-70195.

assurance is made clear. Because any sale will involve questions regarding the ultimate number of wells the State will be responsible for plugging, it will be critical to identify the funds available to the State to complete that plugging.

## B.  PROTECTIVE LANGUAGE SHOULD BE INCLUDED IN ANY SALE ORDER.

74.    For the avoidance of doubt, well plugging and abandonment obligations cannot be extinguished under section 363(f) of the Bankruptcy Code. *See In re GMC*, 407 B.R. 463, 508 (S.D.N.Y. 2009).

75.    If the Court approves the sale over the State's Objection, the State requests that the following language be added to any order approving the Trustee's Motion to mitigate the issues the State has raised in this Objection:

> Notwithstanding any other provision in the Motion, this Order or any implementing use, sale, or transfer documents (collectively, the "Sale Documents"), any sale, assignment and/or transfer of any wells subject to the New Mexico oil and gas regulatory program (the "Wells") will be ineffective with respect thereto absent the consent of the State of New Mexico. To provide the State of New Mexico a timely opportunity to review the transfer of Wells, the Buyer is required to file the change of operator application and all supporting documents required under 19.15.9.9 NMAC for all Wells subject to this Order within 30 days of entry of this Order. Failure of the Estate and/or Buyer to file a change of operator application within 30 days of entry of this Order will void the sale as to any Well or Wells not included in a timely application. If the New Mexico Oil Conservation Division denies the change of operator application for any Well or set of Wells, the sale will be immediately void as to any Well or Wells subject to that denial.

> The Trustee and the Buyer agree to comply with all applicable bankruptcy and non-bankruptcy law with respect to the Wells, and nothing in the Sale Documents shall otherwise affect any decommissioning obligations and financial assurance requirements applicable to the Wells as determined by the New Mexico Oil Conservation Division (the "Division") that must be met by the Estate and/or the Buyer, as applicable. Moreover, nothing in this Order or the Sale Documents shall be interpreted to require the State of New Mexico to novate, approve or otherwise consent to the assumption, sale, assignment and/or transfer of any interests in the Wells.

For the avoidance of doubt, in order to obtain the consent of the State of New Mexico to the assumption, sale, assignment and/or transfer of any interests in a Well, the Buyer must satisfy all requirements of 19.15.5.9 NMAC and 19.15.25.8 NMAC including, but not limited to, requirements that the buyer provide financial assurance acceptable to the Division and that the Buyer enter into an agreed compliance order setting a schedule for compliance with 19.15.25.8 NMAC acceptable to the Division.

For further avoidance of doubt, to the extent the State consents to a sale or transfer of Wells, nothing in the State's consent will waive or hinder the State's rights and authority to recover the costs of plugging any wells, including, but not limited to those remaining in the Estate or sold by the Estate, including rights related to forfeiture of financial assurances, enforcement of work obligations, or pursuit of claims in the bankruptcy.

Notwithstanding any provision to the contrary in this Sale Order ("Order"), any sale agreement, or any other document related to the possible sale, nothing shall:

i. release, nullify, preclude, exculpate, or enjoin the enforcement of any police or regulatory power or any liability that any entity would be subject to as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the date of entry of this Order;

ii. affect the setoff or recoupment rights of any Governmental Unit, as defined in the Code at 11 U.S.C. § 101(27) ("Governmental Unit");

iii. confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

iv. authorize the assumption, assignment, sale or other transfer of any state or federal (a) grants, (b) grant funds, (c) contracts, (d) rights of way, (e) agreements, (f) awards, (g) task orders, (h) property, (i) intellectual property, (j) patents, (l) leases, (l) certifications, (m) applications, (n) registrations, (o) billing numbers, (p) national provider identifiers, (q) provider transaction access numbers, (r) licenses, (s) permits, (t) covenants, (u) inventory, (v) guarantees, (w) indemnifications, (x) data, (y) records, or (z) any other interests belonging to any Governmental Unit (collectively, "Governmental Interests") without compliance by the Debtors and Buyer(s) with all terms of the Governmental Interests and with all applicable non-bankruptcy law; for the avoidance of doubt, any assignment of any Governmental Interest is ineffective unless the required Governmental Unit's consent is acquired in accordance with applicable non-bankruptcy law.

v.    be interpreted to set cure amounts or to require any Governmental Unit to novate, approve or otherwise consent to the sale, assumption, assignment or other transfer of any Governmental Interests;

vi.    waive, alter or otherwise limit any Governmental Unit's property rights; or

vii.    expand the scope of 11 U.S.C.§ 525.

Notwithstanding any other provision in this Order or in any sale documents, the United States will retain, and have, the right to audit and/or perform any compliance review and, if appropriate, collect from the Debtor or its successors and assigns including the Purchaser, any additional monies that was owed by the Debtor prior to the assumption and assignment of the Governmental Leases without those rights being adversely affected by these bankruptcy proceedings. The Debtor, the Purchaser, and their successors and assigns will each individually retain all defenses and/or rights, other than defenses and/or rights arising from the bankruptcy, to challenge any such determination; provided, however, that any such challenge, including any challenge associated with this bankruptcy proceeding, must be raised in the United States' administrative review process leading to a final agency determination by Office of Natural Resources Revenue. The audit and/or compliance review period shall remain open for the full statute of limitations period established by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (30 U.S.C. §§ 1701, et seq.).

**WHEREFORE,** the State requests that the Court enter an order denying the Chapter 7 Trustee's Motion to Approve Sale of Certain Oil and Gas Leases and Related Property, filed March 3, 2026, at Doc. 93, and respectfully requests that the Court grant it such other and further relief as the Court deems just and appropriate.

*(Remainder of Page Intentionally Left Blank – Signature Page Follows)*

DATED: March 24, 2026,                                  Respectfully submitted,


_/s/ Abigail Rushing Ryan_                             _/s/ Esther C. Jamison_
Abigail Rushing Ryan                                   Raúl Torrez
State TX Bar No. 24035956                              _Attorney General_
_Bankruptcy Counsel_                                   William G. Grantham
National Association of Attorneys General              Esther C. Jamison
1850 M Street NW, 12th Floor                           _Assistant Attorneys General_
Washington, DC 20036                                   Environment Protection Division
aryan@naag.org                                         New Mexico Department of Justice
                                                       408 Galisteo Street
                                                       Santa Fe, NM 87501
                                                       ejamison@nmdoj.gov


ATTORNEYS FOR THE STATE OF NEW MEXICO
AND THE OIL CONSERVATION DIVISION OF
THE NEW MEXICO ENERGY, MINERALS, AND
NATURAL RESOURCES DEPARTMENT


## CERTIFICATE OF SERVICE

I certify that on March 24, 2026, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Western District of Texas on the parties below via email.

_/s/Abigail Rushing Ryan_
Abigail Rushing Ryan
Bankruptcy Counsel


| **Debtor** | **Chapter 7 Trustee** | **Midland Central Appraisal District** |
|---|---|---|
| Brandon John Tittle | Herbert C. Shelton, II | Julie Ann Parsons |
| Tittle Law Firm, PLLC | Hayward PLLC | McCreary Veselka Bragg & Allen, P.C. |
| 13155 Noel Drive, Suite 900 | 7600 Burnet Rd., Suite 530 | PO Box 1269 Round Rock, TX 78680 |
| Dallas, TX 75240 | Austin, TX 78757 | |
| btittle@tittlelawgroup.com | cshelton@haywardfirm.com | jparsons@mcbalaw.com |

**Midland County**
Perdue, Brandon, Fielder, Collins & Mott, L.L.P.
PO Box 817
Lubbock, TX 79408
lmbkr@pbfcm.com

**New Mexico State Land Office**
Lynn Hamilton Butler
Husch Blackwell
111 Congress Avenue, Suite 1400
Austin, TX 78701
lynn.butler@huschblackwell.com

**New Mexico Oil Conversation Division**
Jessee K. Tremaine and Michael Hall
Assistant General Counsels
Oil Conservation Division
Energy, Minerals and Natural Resources Department
1220 South S. Francis Dr.
Santa Fe, NM 87505
jessek.tremaine@emnrd.nm.gov

**Marquis Reed Gilmore Jr, Gilmore Oil & Gas, LP, Bluebird Energy Corporation, Cibolo Energy**

Jennifer F. Wertz
Beau H. Butler
Jackson Walker, LLP
100 Congress Avenue, Suite 1100
Austin, TX 78701
Email: jwertz@jw.com
Email: bbutler@jw.com

*and*
Robert L. Soza, Jr.
Reagan M. Marble
Brandon Durrett
Robert M. Biedrzycki
1900 Broadway, Suite 1200
San Antonio, TX 78215
Email: rsoza@jw.com
Email: rmarble@jw.com
Email: bdurrett@jw.com
Email: bbiedrzycki@jw.com