**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **Chapter 7** |
| **ACACIA OPERATING COMPANY,** | § | |
| **LLC,** | § | **Case No. 24-70194-SMR** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| **IN RE:** | § | |
| | § | **Chapter 7** |
| **ACACIA RESOURCES, LLC,** | § | |
| | § | **Case No. 24-70195-SMR** |
| | § | |
| Debtor. | § | |

**THE STATE OF NEW MEXICO'S OMNIBUS REPLY TO THE OBJECTIONS TO THE**
**TRUSTEE'S RULE 9019 SETTLEMENT WITH THE STATE**

**COME NOW** the Attorney General of New Mexico on behalf of the State of New Mexico and the Oil Conservation Division ("OCD") of the New Mexico Energy, Minerals and Natural Resources Department (collectively, "New Mexico" or "the State"), and files this Omnibus Reply ("Reply") in support of the Trustee's *Amended Motion Pursuant to Bankruptcy Rule 9019 For Entry of Order Approving Settlement Between the Chapter 7 Trustee and the State of New Mexico and the Oil Conservation Division of the New Mexico Energy, Minerals and Natural Resources Department* (Dkt. #163) ("State Settlement Motion"), in response to various limited objections

---

raised by the "Non-Debtor Parties,"[1] the "Gilmore Parties,"[2] and American Energy Resources, LLC, as they pertain to the Trustee's Settlement Agreement with the State. *See Settlement Agreement* (filed May 22, 2026), Dkt #163-1, *In re. Acacia Operating Company, LLC*, No. 24-70194 ("State Settlement Agreement").[3]

## OVERVIEW

The objections to the State Settlement Motion overlook the fact that, as required by law, the State Settlement Agreement is fair, equitable, and in the best interest of the bankruptcy estates. The State Settlement Agreement enables the State to prosecute estate causes of action that the Trustee would not otherwise be able to bring. The State's prosecution of these causes of action is expected to bring in over half a million dollars to the estate. In addition, without this settlement, the Trustee would be obligated to fulfill his duties to plug the Acacia wells and remediate the soil or face very large fines and penalties. Among other things, the State Settlement releases the Trustee from his obligation to plug and remediate his oil and gas wells where such obligations apply during the pendency of the bankruptcy and waives the OCD's claim for fines and penalty amounts against the Trustee during that time. In exchange, the State will receive 35% of the recovery on estate

---

[1] The "Non-Debtor Parties" or "Companies" are: Chevron U.S.A. Inc. and Chevron Midcontinent, L.P.; XTO Holdings, LLC; ConocoPhillips Company, Concho Oil & Gas LLC, COG Operating LLC, Marathon Oil Co., and Marathon Oil Permian LLC; OXY USA Inc., Anadarko E&P Onshore LLC, Anadarko Petroleum Corporation, Kerr-McGee Oil & Gas Onshore, Limited Partnership, OXY USA WTP Limited Partnership, Occidental Permian Limited Partnership, OXY Y-1 Company; Coterra Energy and Magnum Hunter Production Co.; and Legacy Reserves Operating LP. *See Limited Objection and Reservation of Rights to Chapter 7 Trustee's (I) Motion Pursuant to Bankruptcy Rule 9019 for Entry of Order Approving Settlement Between the Chapter 7 Trustee and the New Era Defendants and (II) Amended Motion Pursuant to Bankruptcy Rule 9019 for Entry of Order Approving Settlement Between the Chapter 7 Trustee and the State of New Mexico and the Oil Conservation Division of the New Mexico Energy, Minerals and Natural Resources Department*, filed June 12, 2026 (Dkt # 168) ("Non-Debtor Parties' Objection").

[2] The Gilmore Parties are: Marquis Reed Gilmore Jr., Gilmore Oil & Gas, LP, Bluebird Energy Corporation, and Cibolo Energy. *See Limited Objection and Reservation of Rights of the Gilmore Parties to the Trustee's Rule 9019 Settlement Motions* (filed June 18, 2026) (Dkt # 169) ("Gilmore Parties' Objection").

[3] The State takes no position on the various limited objections to the Trustee's Settlement Agreement with the New Era Defendants, in which the State played no part.

---

causes of action. As such, the State Settlement Agreement is fair, equitable, and in the best interest of the estates, and should be approved.

## REPLY

**I.     The State Settlement Agreement is Fair, Equitable, and in the Best Interest of the Estate**

1.      The merits of a proposed compromise should be judged under the criteria set forth in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968). *TMT Trailer* requires that a compromise must be "fair and equitable" and in the best interest of the estate. *TMT Trailer*, 390 U.S. at 424; *see U.S. v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984). None of the objections filed assert that the State Settlement is *not* fair and equitable. And, neither of the limited objections—filed by the Non-Debtor Parties and the Gilmore Parties—assert that the State Settlement is not in the best interest of the estates. The American Energy Resources (AER) objection asserts that the State Settlement is not in the best interest of the estate, but AER fails to support or substantiate this argument. More importantly, as discussed further below, AER's objection was not properly filed and should be stricken from the record.

2.      In determining whether a proposed compromise is fair and equitable, a Court should consider the following factors:

> a.     the probabilities of ultimate success should the claim be litigated;
> b.     the complexity, expense, and likely duration of litigating the claim;
> c.     the difficulties of collecting a judgment rendered from such litigation; and
> d.     all other factors relevant to a full and fair assessment of the wisdom of the compromise. *TMT Trailer*, 390 U.S. at 424. The Fifth Circuit has further elaborated on the factors to be considered in evaluating the wisdom of a proposed settlement. One factor to be considered is "the paramount interest of creditors with proper deference to their reasonable views." *Connecticut Gen. Life Ins. Co. v. United Companies Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Another factor bearing on the wisdom of the

compromise is the extent to which the proposed settlement is the product of arms-length negotiation.

*Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995).

3. In deciding whether to accept a compromise, a trustee is required to reach an informed judgment, after diligent investigation, as to whether it is prudent to eliminate the inherent risks, delays, and expense of prolonged litigation. *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 212 F.3d 632 (1st Cir. 2000).

4. A court is not to substitute its own judgment for that of the trustee, but rather to "canvass the issues" and determine whether the settlement "falls below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 609 (2d Cir. 1983).

5. The State Settlement, negotiated over several months, is in the best interest of the bankruptcy estates because the settlement will bring in at least $650,000. Absent the State Settlement, the Trustee would not have the resources to prosecute the estate causes of action filed in the State Court Case. The bankruptcy estates would also be unable to fulfill the Trustee's outstanding plugging and remediation duties under state law. Under Supreme Court and Fifth Circuit law, these duties cannot be abandoned and must be adhered to during the bankruptcy, as explained more fully below.

**A. Under *Midlantic* and Fifth Circuit Precedent, the Trustee Cannot Abandon These Wells and Must Manage the Estates in Compliance with State Laws.**

6. Abandonment is expressly impermissible under applicable binding Supreme Court and Fifth Circuit precedent. *Midlantic Nat'l Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494 (1986) ("*Midlantic*"); *In the Matter of H.L.S. Energy Co.*, 151 F.3d 434, 438 (5th Cir. 1998).

7. 28 U.S.C. § 959(b) provides, in pertinent part, that "a trustee . . . shall manage and operate the property in his possession as such trustee . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b).

8. The Supreme Court in *Midlantic* held that "[n]either the Court nor Congress has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety," 474 U.S. at 502, and that 28 U.S.C. § 959(b) "provides additional evidence that Congress did not intend for the Bankruptcy Code to pre-empt all state laws," *id.* at 505.

9. Ultimately, the Court held "that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id*. at 507. Further, the estates must be managed and operated in accordance with state law pursuant to Section 959(b), which also precludes abandonment without remediating the real property. A liquidating trustee may not "*maintain[] or possess[]*the estate in continuous violation" of state environmental laws. *In re Wall Tube & Metal Prods. Co*., 831 F.2d 118, 122 (6th Cir. 1987) (emphasis in original).

10. United States Bankruptcy Judge Marvin Isgur subsequently interpreted *Midlantic* as follows:

> The Court reads the Supreme Court's *Midlantic* opinion to require the Court to determine whether the debtor is violating a statute "reasonably designed to protect the public health or safety from identified hazards," not the extent to which particular conduct imposes actual and imminent threats. *Midlantic*, 474 U.S. at 507, 106 S.Ct. 755 ("we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards"). This Court need not make a determination whether the environmental hazard presents an imminent or identifiable harm. It is enough that the Commission's claim arises from a state law designed to protect the public from an identified hazard. It is not the Court's

prerogative to replace the legislature's judgment with its own judgment as to what conduct constitutes a sufficient threat to the public.

*In re Am. Coastal Energy, Inc.*, 399 B.R. 805, 813 (Bankr. S.D. Tex. 2009).

11.     The Fifth Circuit has held that a state oil and gas law requiring well plugging qualifies as "a state law reasonably designed to protect public health or safety" under *Midlantic*. *In the Matter of H.L.S. Energy Co.*, 151 F.3d at 438. In that same decision, the Fifth Circuit held that a chapter 7 trustee is obligated to comply with environmental law even for property not "operated" by the chapter 7 estate. *Id.* at 439. The court also explained:

> The trustee argues that the costs incurred by the state in connection with plugging the unproductive wells did not "benefit" the estate. Of course this is true—in the sense that the bankrupt estate and its creditors would have been happy to abandon the unproductive wells, leaving them unplugged in abdication of HLS's obligations under Texas law. But bearing in mind that the "benefit" requirement is simply a gloss on the underlying concept of what is "necessary," our notion of "benefit" cannot be limited to the narrow sense that the trustee urges.

*Id.* at 438.

12.     The State's claims against the estates in its State Court Lawsuit seek to enforce state regulations designed to protect human health, safety, and the environment, including by compelling the timely plugging of inactive wells. *See, e.g.*, 19.15.25.6 NMAC (explaining that the purpose of the regulatory scheme for plugging and abandoning wells is, among other things, "[t]o establish requirements for properly abandoning and plugging wells drilled for oil or gas . . . to protect public health, fresh water and the environment"); 19.15.25.13(B) NMAC (temporary abandonment requires proving that "casing and cementing are mechanically and physically sound and in such condition as to prevent . . . the contamination of fresh water or other natural resources; and . . . the leakage of a substance at the surface").

13.     The State Court Complaint describes how "inactive oil and gas wells are capable of emitting toxic and hazardous gases such as methane and hydrogen sulfide, as well as volatile

organic compounds, including benzene and toluene," and that "[t]hese emissions present major public health threats, because exposure to volatile organic compounds such as benzene has been linked to increased risks for leukemia, asthma, and low birth weight." Complaint ¶ 39, at 10–11.

14. The State Court Complaint includes photographs and descriptions of several of the Debtors' wells, referencing methane and hydrogen sulfide emissions, soil contamination, and produced water spills. *See generally* Complaint at 10–16. One of the wells, which had "a significant methane leak," *see* Complaint ¶ 49 at 16, was plugged during the bankruptcy by OCD using the State Reclamation Fund, *see also* § I(D), *infra*.

**B. The State Settlement Agreement Releases the Trustee from his Current Liabilities under New Mexico Law.**

15. Under the status quo, the Trustee carries significant liability based on his ongoing obligations on behalf of the estates to comply with the plugging and related requirements of New Mexico's Oil and Gas Act during the bankruptcy. Absent the State Settlement, the State would be free to pursue an enforcement action against the estates, via the Trustee, for ongoing violations of the New Mexico Oil and Gas Act and its implementing regulations, including injunctive relief, civil penalties, and reimbursement. Such enforcement is a paradigmatic example of the permissible exercise of a governmental unit's police and regulatory power under the exception to the automatic stay provided by 11 U.S.C. § 362(b)(4).

16. In exchange for 35% of any settlement recovery, the State is agreeing to release the Trustee from his liabilities under State law to plug and remediate oil and gas wells for the period of the bankruptcy. *See* 28 U.S.C. § 959(b) ("[A] trustee. . . shall manage and operate the property in his possession as such trustee . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."). The wells in Acacia's portfolio are all inactive, with no

reported production since July 2024. *See* OCD, *Summary Balancing Report for Acacia Operating Company, LLC* (accessed June 23, 2026), attached as **Exhibit A**[4]; OCD, *Inactive Well List for Acacia Operating Company, LLC* (accessed June 23, 2026), attached as **Exhibit B**[5]. New Mexico's Oil and Gas Act and implementing regulations require that "90 days after . . . a period of one year in which a well has been continuously inactive," an operator of such wells either: (i) plug and abandon those wells; or (ii) place the wells in temporary abandonment status. 19.15.25.8(B) NMAC.[6]

17.     OCD would likely not approve an oil and gas operator's application to place that many—currently 364—inactive wells into temporary abandonment. But assuming it could approve some of them, placing more than 100 wells into temporary abandonment status would require the Trustee to acquire financial assurance of $1,000,000. *See* 19.15.8.9(D)(2)(d) NMAC. The Trustee would also have to seek OCD approval by submitting a C-103 form and providing evidence to show that all of the wells' "casing and cementing are mechanically and physically sound and in such condition as to prevent: (1) damage to the producing zone; (2) migration of hydrocarbons or water; (3) the contamination of fresh water or other natural resources; and (4) the leakage of a substance at the surface." 19.15.25.13(B) NMAC. The Trustee would therefore have to provide evidence of the wells' structural integrity before placing the wells into temporary abandonment.

18.     If the Trustee cannot afford to place the wells into temporary abandonment, or return the remaining wells to production, the Trustee must then plug the wells. Plugging alone

---

[4] Summary Balancing reports for all New Mexico oil and gas operators are publicly available at https://wwwapps.emnrd.nm.gov/ocd/ocdpermitting/reporting/Production/C115BalancingSummary.aspx.

[5] The inactive well list for all New Mexico oil and gas operators is publicly available at https://wwwapps.emnrd.nm.gov/ocd/ocdpermitting/reporting/Compliance/InactiveWells.aspx

[6] *See* N.M. Stat. Ann. § 70-2-12(B)(1) (authorizing OCD to promulgate rules requiring the plugging and abandonment of oil and gas wells).

costs, on average, $163,000 per well. So, the Trustee's total plugging liability is approximately $59,332,000. The Trustee has neither returned any of the wells to production, plugged the wells, nor placed the wells in temporary abandonment. The Trustee can neither afford to place the wells into temporary abandonment, nor plug the wells in accordance with State law.

19.     The Trustee's decision to settle the State's claims for 35% of his recovery under the New Era Settlement in order to bring in 65% of the recovery and shield the estates from the substantial cost of complying with injunctive orders and satisfying penalty demands available to the State under the New Mexico Oil and Gas Act during the bankruptcy is thus fair and equitable and in the best interest of the estates. *TMT Trailer*, 390 U.S. at 424.

**C.     If the State Settlement Agreement is Not Approved, New Mexico's Administrative Claims Would Far Exceed $350,000.**

20.     If the Court does not approve the State Settlement Agreement, the State will bring administrative claims against the estates for: plugging and remediation costs expended during the pendency of the bankruptcy; future plugging and remediation costs that will be incurred before the bankruptcy closes; and attorneys' fees and costs. Costs incurred by a state in plugging a debtor's wells during the course of bankruptcy are entitled to administrative expense priority under clear Fifth Circuit authority. *Matter of H.L.S. Energy Co., Inc.*, 151 F.3d at 438. The State may also bring the maximum fines and penalties allowable under the Oil and Gas Act, up to $76,600,000 ($2,500 per violation/well per day, for the now 546 days of the bankruptcy, reduced by a cap of $200,000 for each violation). *See* 19.15.5.10(D) NMAC. It is hard to see how this course of action would bring any benefit to the estates; rather, it would only create more attorney' fees for the Gilmore Parties and Non-Debtor Parties.

---

**D.    Objectors who are Not Parties to the Settlement Agreement Cannot Ask this Court Change the Terms of the Agreement, Including Restricting How the State Uses the Funds Allocated to It.**

21.    Without citing any authority for their requests, the limited objections of both the Non-Debtor Parties and the Gilmore Parties request additional language be added to the Settlement Approval Order limiting how the State uses those funds and requiring the State to provide an accounting for its use of the settlement funds.

22.    "Approval of a compromise under Rule 9019 is within the discretion of the bankruptcy court. However, a court cannot sustain an objection to the settlement while granting the motion to approve the settlement. 'In so doing, the court changes the essential terms of the proposed settlement and violates the purpose and spirit of Federal Rule of Bankruptcy Procedure 9019 or decides issues not necessary . . . .' Instead, the court's limited role is to determine whether the settlement should be approved or disapproved as proposed." *In re McDermott*, No. 05-17387 (DHS), 2008 Bankr. LEXIS 968, at *15 (Bankr. D.N.J. Mar. 27, 2008) (internal citations omitted).

23.    As set out above, a bankruptcy court should approve or disapprove a settlement but should not change the essential terms of the settlement based upon an objection—particularly by a non-party to the settlement.

24.    State law governs the use and disbursement of any monies recovered. *See e.g.*, N.M. Stat. Ann. § 6-4-2 ("[T]he state treasurer shall credit all revenues not otherwise allocated by law" to the general fund).

25.    It was through the authority of the New Mexico Attorney General that the State was able to enter into this compromise and settlement on behalf of the State of New Mexico. *See* N.M. Stat. Ann. § 36-1-22; *see also State ex rel. State Eng'r v. United States*, 2018-NMCA-053, ¶ 14, 425 P.3d 723, 730–31 ("[I]t is clear that the Legislature has delegated to the Attorney General the

explicit authority to initiate, conduct, dismiss, and compromise litigation on behalf of the State." (citations omitted)). The Attorney General also has statutory authority to represent OCD and to bring civil actions under the Oil and Gas Act. N.M. Stat. Ann. § 70-2-28.

26. And, once this agreement was made, the distribution of the funds is left up to New Mexico State Law. For example, the Oil and Gas Act specifies that, when OCD is pursuing a civil action against an operator for "*indemnification* for . . . costs incurred by the division in plugging the well or restoring or remediating the well site" which are paid *from* the Reclamation Fund, "[a]ny funds collected pursuant to a judgment in a suit for indemnification brought under the Oil and Gas Act shall be deposited in the oil and gas reclamation fund." N.M. Stat. Ann. § 70-2-38(B).

27. OCD has plugged one of Acacia's wells during the bankruptcy using money from the Reclamation Fund. *See C-103 Plugging Report for API 30-005-61551* (dated June 6, 2025), attached as **Exhibit C**; *Invoices for Plugging of Tolmac State #002*, attached as **Exhibit D**. However, there may still be remediation needed for that site, and the site has not yet been released. The State intends to use some of the $350,000 to reimburse the Reclamation Fund for those costs, even though these funds were not obtained pursuant to a judgment, as § 70-2-38 contemplates.

28. The implication of the Non-Debtor Parties' and Gilmore Parties' request for a limitation on the State's use of the remaining funds is that it would be a meaningful contribution to the outstanding plugging liability for the Debtors' 364 inactive wells.[7] On average, it costs the State $163,000 to plug a single well, not including restoration and remediation. If feasible, $100,000 of the $350,000 will go to the Reclamation Fund to reimburse the State for the plugging of one well during the bankruptcy, and possibly more, depending on needed remediation.[8] The

---

[7] *See* Ex. B, attached.
[8] *See* Ex. D, attached.

remaining funds would barely cover the plugging and remediation costs for two more wells. The State would not settle its claims for the plugging of 364 inactive wells for such a paltry sum. The 35% share of recovery the State is receiving *from the Trustee* does not release any of the remaining defendants in the State case from their liability for the 364 inactive wells in Acacia's portfolio.

29. In sum, there is no legal basis for the Gilmore Parties' or the Non-Debtor Parties' objections or requests related to the State's use of the settlement funds.

30. Finally, the Non-Debtor Parties and Gilmore Parties express concern that the State Settlement Agreement constrains them from bringing their own administrative claims against the Estate. Nothing in the State Settlement Agreement is intended to do so.

**E. The Allocation to the State is Fair and Equitable.**

31. The Gilmore Parties' limited objection asserts that the State Settlement Agreement impermissibly seeks to bypass the Bankruptcy Code's priority scheme by allocating a portion of the funds recovered through settlement of the Uniform Voidable Transactions Act (UVTA) and other estate claims to the State. However, the allocation in the State Settlement Agreement is proper because the estate's recovery was only possible because the State (not the Trustee) discovered the UVTA claims. Once discovered, the State informed the Trustee about these claims, and, with the Trustee's agreement, the State drafted and filed the complaint (which was immediately abated) and has since worked with the Trustee to come to this fully negotiated, arm's length settlement agreement.

32. The proposed allocation to the State is in exchange for the State releasing the Trustee from his duty to plug and remediate the oil and gas wells, and for the State's agreement not to assess fines and penalties against the Trustee. Further, the State's settlement amount is far less than any amount that the State would seek as an administrative claim, and this Settlement

ensures that the majority of recovered funds will be available for distribution to other creditors—a result that would not have happened without this settlement.

33. The Trustee's settlement with the New Era Parties, and associated recovery, is only possible because of the State Court Litigation pursued by the State, for which the Trustee has delegated his authority to the State. The Trustee has recognized, in the 9019 motion regarding the State Settlement, that "[t]he State is in the best position to pursue these claims," that "the estates have limited resources," and that "[t]he proposed division of proceeds recognizes the estates' interest in New Mexico's diligent pursuit of these claims and simultaneously provides New Mexico an incentive to prosecute causes of action that would benefit the estates." State Settlement Motion ¶ 34. No objection disputes these assertions. The proposed settlement, which recognizes and provides for the State's derivative standing to pursue the actions giving rise to the recovery, is therefore fair and equitable and in the best interests of the estates.

34. The proposed allocation in the State Settlement is also fair and equitable and in the best interests of the estates. As demonstrated by the Trustee's statements in the 9019 motion, the Trustee would not have been able to bring the UVTA and related claims on his own and, if compelled to litigate the claims by himself, would have had to abandon those claims, recovering nothing for the estates.

35. Other bankruptcy courts have held that a negotiated allocation was proper under extremely similar circumstances. In *In re Full Spectrum Management*, a bankruptcy court approved a 9019 motion providing for allocation of recovery resulting from an action brought under derivative standing where "[a]bsent the settlement, the Trustee testified that the estate would not have the funding to pursue the claims . . . , and effectively would have to abandon these claims." *In re Full Spectrum Mgmt., LLC*, 621 B.R. 421, 432 (Bankr. W.D. Mich. 2020).

---

36.     In reaching that decision, the bankruptcy court recognized that the proposed allocation effectively served as an alternative means of litigation financing, and that any alternative litigation financing arrangement (assuming one were even available to the estate) "would likely be reimbursed as administrative expenses under 11 U.S.C. § 503(b)" and that "[t]hese administrative expenses would reduce the amount of any recovery that would be available to creditors." *Id.* The court concluded that "the settlement allows the estate to avoid costly litigation . . . , while also providing litigation funding, including out-of-pocket costs and attorney fees, for the adversary proceeding." *Id*. at 433. So, too, here.

37.     The *In re Full Spectrum Management* bankruptcy court ultimately approved the 9019 settlement that provided for allocation of just 25% of recovery to the estate. *Id*. Key to this approval was the bankruptcy court's recognition that "aside from the causes of action, there are no other assets in this case," and that "[a]bsent the settlement, this would be a no asset case" where other creditors "would receive nothing." *Id*. at 434.

38.     The same applies to the present case. The only realistic prospect for any recovery for the estates is via the New Era Parties Settlement, which is only possible because of the State's State Court Lawsuit. No creditor of the Acacia debtors would recover anything absent the State's lawsuit and the proposed settlements. The only difference between this proposed settlement and the one approved in *In re Full Spectrum Management* is that in this case the majority of the recovery—65%—will be allocated to the estate for distribution to other creditors. Just as the *In re Full Spectrum Management* bankruptcy court found that proposed settlement to be "fair and equitable," so too should this Court.

---

**II.     The Objectors Should Not be Reimbursed for Meeting their Statutory, Regulatory, and Contractual Obligations.**

    **A.     The State Objects to the Non-Debtors' Request that the State's Settlement with the Trustee Should Directly or Indirectly Go to them.**

39.     The Non-Debtor and Non-Settlement Parties mention that "the State of New Mexico is imposing the plugging and remediation obligations related to the Leases and Wells on the Non-Debtor Parties," and so the $350,000 should either go to plugging wells or to reimburse the Non-Debtor Parties. However, it is important to note that the *State Land Office* (SLO) is imposing these obligations against the Non-Debtor Parties related to leases on State lands, but the SLO is not a party to the State's case nor is it a party to the State Settlement. Under state law, the Non-Debtor Parties are responsible for plugging costs on state-owned land managed by the SLO because, as they acknowledge in their filings, they "are lessees of record with the SLO . . . on various leases," and are therefore obligated to plug the inactive wells. *See* Non-Debtor Parties' Objection at 5 ¶ 8.

40.     As to the Non-Debtor Parties' objections on the basis of their interest in *future* plugging and remediation of wells on their leases, that objection amounts to a request that the State prioritize plugging Debtors' wells on leases held by the Non-Debtor Parties, thereby relieving the Non-Debtor Parties of those obligations, and requiring the State to find other sources of funding to plug the Debtors' other wells in the State.[9] This request to benefit from, and micromanage, the State's disposition of $350,000 is particularly objectionable coming from a collection of entities,

---

[9] 247 out of 392 of Acacia's current wells are not on State lands.

four of which have a combined net worth of over $600 billion,[10] and can easily afford to take care of their contractual and statutory obligations as lessees of state lands.[11]

41.     If these parties believe that they will end up paying monies for plugging wells that should be plugged by the bankruptcy estates, they can file a proof of claim for those anticipated amounts.

42.     The State therefore objects to the Non-Debtor Parties' request for additional language directing the expenditure of funds to "reimburs[e] parties, including the Non-Debtor Parties, who have incurred or will incur actual costs in performing plugging, remediation, or restoration work on the Debtors' Leases & Wells that was the obligation of the Debtor. The State shall provide an accounting of the use of such funds to any party in interest upon request." Non-Debtor Parties' Objection at 7.

### B.     The State Objects to the Gilmore Parties' Request that it Should Reimburse the Gilmore Parties for Performing the Debtors' Statutory and Regulatory Duties.

43.     Similarly to the Non-Debtor Parties, the Gilmore Parties request reimbursement from the State's 35% recovery for plugging and remediation that they may, potentially, do in the future. Just as the State objects to the Non-Debtor Parties' request, the State similarly objects to the Gilmore Parties' request.

44.     The Gilmore Parties request that the State reimburse them for performing plugging and abandonment on *their own wells*: "[S]ettlement funds paid to New Mexico should be applied

---

[10] Macrotrends, *Chevron Net Worth* https://www.macrotrends.net/stocks/charts/CVX/chevron/net-worth (last visited June 21, 2026) ("Chevron net worth as of June 19, 2026 is $375.65B" based on market capitalization); Macrotrends, *ConocoPhillips Net Worth*, ("ConocoPhillips net worth as of June 19, 2026 is $149.37B"); Stock Analysis, *Occidental Petroleum Corporation (OXY)*, https://stockanalysis.com/stocks/oxy/market-cap/ ("Occidental Petroleum has a market cap or net worth of $51.54 billion as of June 18, 2026."); Macrotrends, *Coterra Energy Net Worth*, https://www.macrotrends.net/stocks/charts/CTRA/coterra-energy/net-worth ("Coterra Energy net worth as of June 19, 2026 is $25.37B.").

[11] The State takes no position on whether the Non-Debtor Parties may have a claim for contribution against the New Era Defendants or any remaining defendants in the State case.

directly to plugging, remediation, and restoration—or to reimburse parties, including the Gilmore Parties, who perform such work." Gilmore Parties Objection at 10 ¶ 27.

45. The State objects to the suggestion that the State should reimburse the Gilmore Parties for plugging and remediating wells that the Debtors are statutorily obligated to perform. If the Gilmore Parties are actively planning to plug and remediate any of Acacia's wells, this is welcome news to the State, and the State looks forward to hearing more about these plans. However, the State will not "reimburse" the Gilmore Parties for fulfilling Acacia's statutory and regulatory obligations.

46. If the Gilmore Parties believe they are fulfilling the Debtor's obligations to plug, they, too may file a proof of claim for those anticipated amounts.

47. The State takes no position on whether the Gilmore Parties may have claims for contribution against the New Era Defendants and does not object to any additional language that may preserve those claims for contribution.

**C.** **The State Has Not Seen, Nor Does it Know the Contents of, the Confidential Settlement Agreement the Gilmore Parties Describe.**

48. The State of New Mexico responds to the Gilmore Parties' language in the proposed order referencing an alleged confidential agreement between the New Era Defendants and the Gilmore Parties. The State has not seen such an agreement and does not know the contents of that agreement and therefore has not contributed to any alleged breach. However, the State does intend to request that agreement during discovery in the State case, once the State case is allowed to proceed. In so doing, the State will honor all legal and ethical obligations regarding handling of confidential material, to the extent those apply.

### III.    State's Response to Samaniego's Objection

49.    Most fundamentally, the objections filed by Jonathan Samaniego on behalf of American Energy Resources (AER) should be stricken from the record because Samaniego is not a licensed attorney, and, under Texas law, corporations may only be represented in court proceedings by licensed attorneys. As recognized by the Southern District of Texas Bankruptcy Court:

> Texas law does not permit a corporation to represent itself in court. In Texas, "only a licensed attorney may practice law. A corporation may not appear in court through its officers who are not attorneys." *Globe Leasing, Inc. v. Engine Supply and Machine Service*, 437 S.W. 2d 43, 45 (Tex Civ. App. -- Houston 1969); Tex. R. Civ. P. 7. Texas law controls here because in the federal courts, except for matters governed by the Federal Constitution or by acts of Congress, the law to be applied is the law of the state.

*In re Cash Media Sys.*, 326 B.R. 655, 673 (Bankr. S.D. Tex. 2005) (internal citations omitted).

50.    However, if this Court does entertain Samaniego's objections, the State replies as follows:

51.    Samaniego's objections to the 9019 Motions were untimely. The 9019 Motions were filed on May 22, 2026, and they include a 21-day objection deadline, making the objection deadline June 12, 2026. However, Samaniego filed AER's objection almost two weeks late on June 22, 2026 (Dkt. Nos. 176, 177, 178, and 179 in Acacia Operating Case No. 24-70194-SMR).

52.    Substantively, Samaniego has not shown that the Trustee's decision to enter into the State Settlement Agreement is an abuse of his business judgment and not in the best interest of the creditors or estates. In fact, the Trustee's decision to enter into the State Settlement Agreement and withdraw the Motion to Sell to AER is well within the business judgement of the Trustee:

53.    *First*, the Sale to AER probably would not be approved because AER is not represented by a licensed attorney. Further, AER cannot meet the requirements under New Mexico law to have the operating authority and liability for the wells transferred from the bankruptcy

Trustee to AER. Separately, AER does not address the harm to the estate and other parties that would occur if the sale were approved but AER was not able to secure transfer of operating authority for the wells. That scenario would result in liability for operating and plugging the wells remaining with the Acacia entities. Because the wells cannot be transferred, the sale should not be approved.

54. *Second*, the bankruptcy estate's recovery from the proposed sale to AER is a very small fraction of the recovered benefits from the settlement with the State. Specifically, the sale to AER was for a gross amount of $40,000. However, without the State Settlement, the bankruptcy estate would still be subject to the State's administrative claim for having plugged one of its wells and it would be subject to fines and penalties for the violations that were ongoing during the bankruptcy. Further, is highly unlikely that AER would be able to meet the requirements to have ongoing liability for the wells transferred out of the bankruptcy estate; so, the Trustee may have been stuck with that plugging and remediation expense, too. Comparing the State Settlement to that of the proposed AER sale shows that the Trustee has used his best business judgment in deciding to enter into the Settlement instead of the Sale.

55. *Third*, To the extent AER believes that this Court can review the OCD's Notice of Noncompliance, it is wrong because a Federal Bankruptcy Court does not have the jurisdiction to hear an appeal of a state's administrative agency order. *See* 28 U.S.C. § 1334.

## **CONCLUSION**

WHEREFORE, the State prays that this Court overrule all pending objections to the State Settlement Agreement and approve the State Settlement Agreement as filed, and for any further relief this Court finds the State entitled.

DATED: June 25, 2026,                                      Respectfully submitted,


*/s/Abigail Rushing Ryan*                                  */s/ Esther C. Jamison*
Abigail Rushing Ryan                                       Raúl Torrez
TX State Bar No. 24035956                                  Attorney General
Bankruptcy Counsel                                         William G. Grantham
National Association of Attorneys General                  Esther C. Jamison
1850 M Street NW, 12th Floor                               *Pro Hac Vice*
Washington, DC 20036                                       Assistant Attorneys General
aryan@naag.org                                             Environment Protection Division
                                                           New Mexico Department of Justice
                                                           408 Galisteo Street
                                                           Santa Fe, NM 87501

                                                           COUNSELS FOR THE STATE OF NEW MEXICO AND
                                                           THE OIL CONSERVATION DIVISION OF THE NEW
                                                           MEXICO ENERGY, MINERALS AND NATURAL
                                                           RESOURCES DEPARTMENT


## CERTIFICATE OF SERVICE

The undersigned certifies that on June 25, 2026, a true and correct copy of the foregoing was served via CM/ECF to all parties requesting service thereby.

                                   */s/Abigail Rushing Ryan*
                                   Abigail Rushing Ryan
                                   Bankruptcy Counsel
                                   National Association of Attorneys General